## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**DALE McCORMICK,**

      **Plaintiff,**

      **v.**                         **Case No.  02-2135-JWL**

**CITY OF LAWRENCE, et al.,**

      **Defendants.**

_____

## MEMORANDUM AND ORDER

Plaintiff Dale McCormick is a self-proclaimed civil rights activist.  He brought this lawsuit *pro se* pursuant to 42 U.S.C. § 1983 claiming that the defendant City of Lawrence and several of its officers violated his constitutional rights during the course of several police actions.  He also claims that defendant M.J. Willoughby violated his constitutional rights while investigating him for the unlawful practice of law.  This matter is currently before the court on the parties' motions for summary judgment (docs. #370, #378 & #380) as well as plaintiff's motion for bifurcated trial (doc. #382).   As explained below, defendant Willoughby's motion is granted, plaintiff's motion for partial summary judgment on the issue of liability on his claim against defendant Willoughby is denied as moot, and plaintiff's motion for bifurcated trial is denied as moot.  The City defendants' motion for summary judgment is granted in part and denied in part.  Specifically, as to plaintiff's First Amendment claims the motion is denied as to defendants Crouse, Mann, Byrn, White, and

Souders, and it is granted as to plaintiff's claims against defendants Farrar, Harvey, and Hadl; as to plaintiff's Fourth Amendment claims against defendants White and Souders, the motion is denied as to his unlawful arrest claim and granted as to his unconstitutional seizure of property claim; and the motion is denied as to plaintiff's claim against the City itself.

### STATEMENT OF MATERIAL FACTS

Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiff, the nonmoving party.

### I.      Claim Against Defendant Willoughby

On May 14, 2001, Merrily Coburn was arrested and charged with aggravated intimidation of a witness in Johnson County District Court.  The judge dismissed the charge, and she and her husband, Robert Coburn, began doing legal research at various law libraries on the crime of aggravated intimidation of a witness under Kansas law and on how when prosecutors swear to the facts in a probable cause affidavit they assume the role of a "complaining witness."  Based on the Coburns' research, they concluded that the district attorney who swore the probable cause affidavit against Ms. Coburn for the charge, Roger Nordeen, acted without probable cause and thus was subject to liability for violating her constitutional rights.  While doing legal research the Coburns came across documents or cases that plaintiff had been involved in which seemed pertinent, so the Coburns called plaintiff to "discuss things."  The Coburns began meeting with Mr. McCormick.  He gave

2

them "various documents, just legal stuff that he was doing and how he was doing it.  He gave [the Coburns] different motions that he had filed, this is the format to use and just those kinds of things."  The Coburns discussed with him the suit he had filed against a Shawnee County prosecutor, *see McCormick v. Board of County Comm'rs*, 272 Kan. 627, 35 P.3d 815 (2001), and the similarities between his case and the case the Coburns were preparing against Mr. Nordeen.

Defendant Willoughby points out that Mr. McCormick provided Ms. Coburn with copies of legal decisions, including for use in the case of *Coburn v. Nordeen*.  He also provided them with the names and captions of cases.  Mr. McCormick assisted the Coburns in "drafting litigation."  He testified in his deposition that he "looked over the pleadings that he was drafting in anticipation of filing the case, *Coburn v. Nordeen*. . . . I looked over those papers and, I guess, gave him my opinion of the argument that he made and the legal work he had done."  According to a statement by Merrily Coburn, Mr. McCormick gave the Coburns "different motions" that he had filed in previous cases, "this is the format to use and just those kind of things."  Mr. McCormick read some of the Coburns pleadings in the *Coburn* case and gave them "suggestions" prior to those pleadings being filed, specifically, the complaint and summary judgment papers.  Mr. McCormick reviewed their pleadings and gave his opinions about whether or not their legal arguments were correct, and made suggestions about corrections of grammar and syntax and spelling.  After Mr. McCormick gave his opinion on the sufficiency of the pleadings, Robert Coburn filed those pleadings in

a case in this court, *Coburn v. Nordeen*, Case No. 01-2562-GTV.  Mr. McCormick offered

to help out the Coburns with what they were doing in the case.

Mr. McCormick admits that he gave the Coburns copies of cases dealing with lawsuits

against prosecutors.  He did not tell the Coburns "about his experience in the law and how

much experience he had."  According to Ms. Coburn's statement, Mr. McCormick did not

"help [the Coburns] prepare anything in [the *Coburn*] case.  He just gave us information, we

discussed the information. My husband and I did everything."  Defendant Willoughby points

out that Ms. Coburn further explained that Mr. McCormick read a few of the Coburns'

pleadings before they were filed and gave the Coburns suggestions about them.  Mr.

McCormick himself admits that he read some of the pleadings the Coburns prepared in the

*Coburn* case and gave some suggestions, such as correcting grammatical and spelling errors,

and expressed his opinion about whether the Coburns' legal arguments were correct, but he

denies any other suggestion or inference.  Mr. McCormick served process for the Coburns

when they filed their lawsuit against Mr. Nordeen.  He never appeared, and never attempted

to appear, in court on behalf of the Coburns.  Other than charging the Coburns a process

server fee, Mr. McCormick was never compensated by the Coburns, and he never asked for

any type of compensation or remuneration from them for the assistance he provided them.

He never represented to the Coburns that he had any "advanced legal knowledge or that he

knew a lot about the law."  According to Mr. McCormick, he "associated with the Coburns

for the purpose of assisting litigation aimed at vindicating their civil rights."

At the time, defendant Willoughby was an Assistant Attorney General with the State of Kansas and Mr. McCormick had brought numerous *pro se* cases against state employees who defendant Willoughby had been assigned to represent.  She represented the defendant Roger Nordeen in *Coburn v. Nordeen*.  She also represented the defendants Cynthia Long and Joan Hamilton in a case brought by Mr. McCormick styled *McCormick v. Board of County Comm'rs*, for which a published opinion can be found at 28 Kan. App. 2d 744, 24 P.3d 739 (2001).  Defendant Willoughby believed that she recognized a similarity in the pleadings, tactics, and other documents which were filed in the *Coburn* and *McCormick* cases.  It is undisputed that Dale McCormick is not licensed to practice law in Kansas.

At some point in time, defendant Willoughby told Mr. McCormick that he "had better not be practicing law without a license."  She did not expressly threaten him or tell him not to speak to or associate with the Coburns.  But, he understood her comment to mean that she "subjectively . . . by implication" told him that she was going to report him for the unauthorized practice of law and, furthermore, that she "by implication, threatened [him] to stop doing what [he] was doing with the Coburns."  Specifically, he testified in his deposition as follows: "Subjectively, the implication of [defendant Willoughby telling Mr. McCormick not to practice law without a license] was that [he] was going to be subjected to some type of action taken by Ms. Willoughby or her lackeys as a result of what [he] was doing."

Defendant Willoughby gave pleadings from the *Coburn* and *McCormick* cases to members of the Kansas Attorney General's Office Consumer Protection Division, specifically, Dave Harder and Shelly Welch.  At the time, the Kansas Attorney General's

5

Consumer Protection Division prosecuted cases for the unauthorized practice of law. According to defendant Willoughby, she reported Mr. McCormick to the Consumer Protection Division because she believed she had an ethical duty to report him for the suspected unauthorized practice of law. She states that she did not participate in the decision about whether to investigate Mr. McCormick for the unauthorized practice of law, but instead the Consumer Protection Division made an independent evaluation of this issue. Mr. McCormick points to evidence to the contrary. In particular, he points to a note from defendant Willoughby to Mr. Harder which states as follows: "[t]he person who signed the certificate of service and delivered this document is a pro se litigant and non-lawyer. He did write this document for the pro se plaintiff Coburn." In a separate email to Ms. Welch, defendant Willoughby wrote, "Would you guys have authority for the proposition that what Dale McCormick is doing (writing briefs for others), is in itself sufficient to constitute practice of law, even if he does not sign same?" In another email to Mr. Harder and Ms. Welch, she stated that she "received another document ostensibly written by . . . Dale McCormick."

The first documented record of defendant Willoughby reporting Mr. McCormick to Mr. Harder is dated January 3, 2002. Within just over a month prior to that date, the Coburns filed their lawsuit against Roger Nordeen and plaintiff served process for them in late November of 2001, and defendant Willoughby lost part of a fairly significant case to plaintiff in the Kansas Supreme Court on December 7, 2001, *see generally McCormick*, 272 Kan. At 627, 35 P.3d at 815. The next day, and before further documentation of plaintiff's emails to

6

Mr. Harder and Ms. Welch, on January 4, 2002, plaintiff served defendant Willoughby with a "Memorandum in Support of Plaintiff's Motion for Partial Summary Judgment" in the *Coburn* case for Ms. Coburn.

Mr. Harder and Ms. Welch initiated a proceeding entitled *In the Matter of the Investigation of Dale E. McCormick.*  In the course of this proceeding, they subpoenaed Ms. Coburn regarding the assistance Mr. McCormick provided to the Coburns in the *Coburn* case.  During the interrogation of Ms. Coburn under that subpoena, Mr. Harder told Ms. Coburn that they were concerned that Mr. McCormick was "undertaking to . . . help people represent themselves," or that "people might be helping people represent themselves," or that plaintiff might "be rendering assistance to others" with filing lawsuits.

Prior to Ms. Coburn being subpoenaed in *In the Matter of the Investigation of Dale E. McCormick*, Mr. McCormick and the Coburns met frequently and associated with each other for the purpose of political discussions, legal discussions, assisting litigation aimed at vindicating civil rights, and simple social interaction.  These activities "were abruptly terminated" after Ms. Coburn was subpoenaed, due, on Mr. McCormick's part, to his "fear of further persecution of [him]self or other people with whom [he] associated in the same manner that the Coburns had been persecuted."  This termination of his association with the Coburns lasted for months.  After Ms. Coburn was subpoenaed, the Coburns "no longer felt safe interacting or associating with" Mr. McCormick.  Also prior to the instigation of *In the Matter of the Investigation of Dale E. McCormick*, Mr. McCormick frequently wrote pamphlets on First Amendment rights and disseminated those and other information to other

7

citizens, through one of his websites and otherwise, based on legal decisions in federal court cases, regarding "what the law allowed in given situations under the 1st Amendment" in "situations . . . related to protests or demonstrations or associations in one way or another." After *In the Matter of the Investigation of Dale E. McCormick* was instigated, plaintiff stopped writing pamphlets and disseminating such information "because [Ms. Willoughby and her cohorts] adopted the absurd position that advising people what the courts had interpreted rights to be was somehow practicing law without a license." Plaintiff did this out of "fear of further reprisal and retaliation at Ms. Willoughby's hand, or at the hands of other agents involved."

In an attempt to establish that Mr. McCormick was engaged in the unauthorized practice of law, defendant Willoughby points to Mr. McCormick's deposition testimony that he has jointly worked on legal filings with people, meaning that he has done legal research and incorporated that legal research into a filing in the sense that he has crafted legal arguments and written those into a filing to be submitted to a court. Mr. McCormick does not deny this, but points out that he gave this deposition testimony in the context of referring to "jointly" working on legal filings with Curtis Kastl in cases where they were co-plaintiffs or co-defendants, or "jointly" working with other prisoners after he became incarcerated in February of 2004, *see* K.A.R. 44-12-702 (an inmate may give legal assistance to another inmate), or making suggestions to Robert and Merrily Coburn about correcting grammatical and spelling errors in their pleadings or expressing an opinion about the validity of the arguments they made in those pleadings. Mr. McCormick also provided legal research to

8

Curtis Kastl's attorney, Craig Stancliffe, who incorporated Mr. McCormick's research into pleadings in Case No. 02-CR-1265.[1]

In this lawsuit, Mr. McCormick claims that defendant Willoughby retaliated against his exercise of his clearly established right to speak and associate with other citizens for the purpose of assisting litigation aimed at vindicating civil rights by filing the complaint with the Consumer Protection Division, fabricating evidence to include in the complaint, and causing Ms. Coburn to be subpoenaed and threatening her into terminating her and her husband's association with Mr. McCormick, all of which would have chilled a person of ordinary firmness from continuing to engage in the protected activities.  The parties have now filed cross-motions for summary judgment on this claim.  Defendant Willoughby seeks summary judgment on the grounds of qualified immunity inasmuch as she contends that (1) plaintiff has not raised genuine issues of material fact sufficient to withstand summary judgment on the various elements of this claim, and (2) the law was not clearly established such that a reasonable official would have understood that what she did violated Mr.

---

[1] With respect to those aspects of defendant Willoughby's Statement of Uncontroverted Facts that are not included in the court's Statement of Facts, the court sustains plaintiff's objections and excludes them from the summary judgment record largely because they are either not supported by the evidence of record cited by defendant Willoughby and/or defendant Willoughby has not shown them to be relevant to the particular claim at issue.  For example, paragraphs 51-61 describe other instances in which defendant Willoughby contends that Mr. McCormick was practicing law without a license, but she does not point to any nexus between these other instances and her alleged retaliatory conduct by showing that these other instances occurred before her alleged retaliatory conduct or that she was even aware of them at the time.

McCormick's constitutional rights.[2]  Mr. McCormick, in turn, contends that he is entitled to summary judgment on the issue of liability.

## II.     <u>Claims Against the City Defendants</u>

As a self-described "natural person and civil rights advocate," Mr. McCormick does "anything in [his] power to prevent the erosion of constitutional rights."  Prior to the events that form the basis of this lawsuit, Mr. McCormick had numerous brushes with the police officers in Lawrence.  These various incidents culminated in plaintiff's driver's license being suspended as well as him being convicted of felony possession of marijuana, misdemeanor obstruction of legal duty, and two counts of driving with a suspended driver's license.  The various encounters resulted in a series of incidents in which Mr. McCormick engaged in conduct which could fairly be regarded as "heckling" Lawrence police officers, in various forms and degrees, purportedly in exercise of his First Amendment rights.  He asserts claims against the defendant City of Lawrence as well as the following individuals who were employed by the City as police officers at the time of the incidents in question: Gil Crouse, James White, Leo Souders, Chris Mann, Ken Farrar, Mike Byrn, and Sam Harvey.  In addition, defendant Susan Hadl is and was at all relevant times a sergeant in the City's police department.  The specific incidents that form the basis for his claims are as follows.

---

[2] Defendant Willoughby also contends that plaintiff lacks standing to assert his claim. This argument is patently without merit, as it is well settled that a claim that one's own constitutional rights have been infringed is sufficient to confer standing.  *See Lippoldt v. Cole*, 468 F.3d 1204, 1221 (10th Cir. 2006) (noting the deprivation of First Amendment rights constitutes injury); *Owens v. Rush*, 654 F.2d 1370, 1379 n.11 (10th Cir. 1981) (noting an allegation that constitutionally protected rights were infringed confers standing).

A.      _Defendant Crouse Parked In Front of Plaintiff's Driveway_

The first incident occurred on December 27, 2001, when plaintiff came home to find defendant Crouse parked in front of his house, blocking his driveway.  According to defendant Crouse, he had stopped at the intersection to monitor the four-way stop at the intersection, he had blacked out his patrol car, and he did not know that Mr. McCormick resided at the particular house in question.  When plaintiff returned home, he could not enter his driveway because defendant Crouse's patrol car was parked there.  After waiting behind the patrol car with his turn signal flashing, plaintiff honked his horn.  Defendant Crouse then moved his patrol car out of the way.  Plaintiff turned into his driveway, exited his automobile, and carried several items into his house.

Plaintiff then returned outside and "stood in [his] yard and asked Crouse why he had been illegally parked in front of [his] driveway."  At first, he did not yell or use profane language; he was calm and jovial, albeit slightly perturbed at how defendant Crouse had been illegally parked and failed to move his car for several minutes after being alerted to Mr. McCormick's presence.  When defendant Crouse responded that he was not illegally parked, plaintiff called him a "cognitively impotent pig."  Defendant Crouse then "yelled with great fury that if [Mr. McCormick] did not watch it, 'this pig [was] going to take [him] to jail.'"  This angered plaintiff, he told defendant Crouse to hold on one minute, and he went back inside his home to retrieve his video camera.  The rest of the incident is captured on video.

That video establishes that plaintiff walked around the police car to the middle of the street near the driver's door of the patrol car to confront defendant Crouse.  He asked if

11

defendant Crouse was going to arrest him, and Crouse responded that he might take him to jail for disorderly conduct.  Mr. McCormick proceeded to call defendant Crouse a "pig" and a "stupid ass pig," commenting that he was using the camera "to film you fucking pigs all the time, 'cause you pigs make me sick."  He explained that defendant Crouse was threatening to violate his rights by threatening to arrest him for coming out there and asking what his "pig ass" was doing parked in front of his driveway.  In response to defendant Crouse's remark that the arrest would be for being disorderly, Mr. McCormick asked, "Am I being disorderly?"  And, defendant Crouse responded, "You are when you're out here calling me a pig."  Mr. McCormick told defendant Crouse to get out of his neighborhood and they debated the issue of whether it was permissible for defendant Crouse to have been parked in front of his driveway.  The dialogue concluded with Mr. McCormick telling defendant Crouse to "have a good evening, pig" and to "[t]ry not to park in front of my driveway, anymore."

According to defendant Crouse, he did not at any time intend or threaten to arrest plaintiff for what he was saying.  Instead, he believed plaintiff was being disorderly because he was being loud and using offensive, obscene, and abusive language that aroused alarm, anger, or resentment in others.  For that reason only, he warned plaintiff that he would be arrested for disorderly conduct if he did not move from the street and lower the volume of his discourse.  Defendant Crouse states that he did not arrest plaintiff because, after the warning, plaintiff ceased being disorderly.

B.      *Traffic Stop Involving Defendant Mann*

At 12:35 a.m. on Thursday, January 10, 2002, defendant Mann and another police officer were conducting a traffic stop in the 1000 block of New Jersey in Lawrence. Plaintiff drove by, parked down the block, then walked about a half block on the sidewalk to a point roughly twenty-five feet from the stopped vehicle, where he assumed a position on the sidewalk. From that location, he calmly and in a normal tone of voice told the officers to leave the people in the stopped vehicle alone. He did not swear, use profanity, or raise his voice louder than necessary for it to be heard by the officers. Defendant Mann asked plaintiff if he knew the people involved in the traffic stop and asked him what his "fucking problem" was. Plaintiff responded that living in a police state was his problem, that defendant Mann harassing people was his problem, and that he should leave the people he had stopped alone. Defendant Mann then yelled at plaintiff that if he did not "shut the fuck up" and leave the area that he would be arrested for obstructing or interfering with police duties.

According to defendant Mann, he was aware that in past encounters with police officers Mr. McCormick had been in possession of a firearm. Because of the time of the stop, Mr. McCormick's proximity to the stop and his animated behavior, and the fact that he was known by defendant Mann to carry a firearm, defendant Mann feared for the safety of all those involved in the stop. Also, defendant Mann believed that his ability to perform the traffic stop was impeded by Mr. McCormick's proximity to the stop, the volume at which he was yelling, and the fear that he invoked in defendant Mann. Thus, defendant Mann informed him that he needed to move away from the traffic stop, quiet down, and stop

obstructing the performance of the officers' duties.  Defendant Mann ultimately ended the traffic stop.

Defendant Mann then radioed a report of the incident to his supervisor and learned that plaintiff's driver's license had been suspended.  Defendant Mann also suspected – based on Mr. McCormick's antics – that he might be intoxicated and followed him.  After Mr. McCormick stopped in the middle of the roadway at a green light, defendant Mann engaged his emergency lights.  Defendant Mann then arrested him for driving with a suspended driver's license.

C.      *Incident at Municipal Court Involving Defendants Byrn and Farrar*

The morning following the traffic stop incident involving defendant Mann, Mr. McCormick appeared at municipal court.  He approached the window of Rebecca Coffman to discuss reinstatement of his driver's license.  According to the affidavit of Ms. Coffman, Mr. McCormick hit the window with a tape recorder and, in a profanity-laden tirade, demanded to know why his license had been suspended, threatening to sue her "incompetent agency" unless she contacted the state and had his driver's license reinstated.  In Mr. McCormick's affidavit, however, he denies her characterization of the events, explaining that his demeanor was calm and jovial.  Ms. Coffman summoned the municipal prosecutor, Gerard Little, for help.  When Mr. Little explained to Mr. McCormick why his driver's license had been suspended, Mr. McCormick told him that was a "crock of shit."

Shortly, defendant Byrn responded to a police call from municipal court.  According to an affidavit from defendant Byrn, when he arrived he observed plaintiff and Mr. Little

14

having a very loud discussion in the public lobby of the municipal court building, and he believed that plaintiff was being especially abusive and using profanities as he "discussed" the issues with Mr. Little.  As defendant Byrn approached the scene, plaintiff turned to him and said, "Hi, pig!"  Mr. Little then told defendant Byrn as follows: "He's being loud-mouthed and disorderly.  I'm going to have to leave."  Mr. Little then told Mr. McCormick, "If you want to appeal to court, that's fine."  Defendant Farrar also responded to the call.  When plaintiff noticed him arrive, he told defendant Farrar that he was a "lying, amoral, unethical, perjurious piece of shit."  Defendant Byrn warned plaintiff that if he did not leave the municipal court building he would be arrested for disorderly conduct.  According to defendant Byrn's affidavit, at no point in time did he intend or threaten to arrest plaintiff for the things that he was saying.  Rather, he warned plaintiff that he would be arrested for being disorderly because he was being loud, offensive, obscene, and abusive in a public place that aroused actual alarm, anger, and resentment in others.  He did not arrest plaintiff because he calmed down and stopped being disorderly.

At some point after the officers stopped what Mr. McCormick characterizes as threatening and harassing him, he proceeded to converse with a different woman from the clerk's office that was at the window.  After several minutes, she understood his problem and agreed to send information to the State of Kansas indicating that her office had made a mistake and that his license should not be suspended.  He then left the building.

D.     _Plaintiff's Protest Involving Defendants White and Souders_

Later that day, at approximately 11:00 p.m. that evening, defendant Souders observed two men who looked like "skinheads" pushing a moped out of a parking stall, and he stopped to investigate. The two men identified themselves as John Canton and Thomas Meagher. Mr. Canton explained that it was his moped, that it had died earlier that day, that he had pushed it into the parking stall, and that he and Mr. Meagher had returned to retrieve it. As defendant Souders was obtaining and checking that information, defendant White stopped to assist him because the "skinheads" concerned him. Meanwhile, plaintiff approached the scene. He assumed a position on the public sidewalk approximately twenty feet from their location and began calmly and jovially, in a normal tone of voice loud enough to be heard by the officers (but not yelling or screaming), telling the officers to leave the two men alone. He did not utter profane words, or make any threats or threatening gestures. Defendant White immediately told him to stop speaking and leave the area or he would be arrested, and then he proceeded to approach Mr. McCormick.

According to the affidavits of defendants Souders and White, about that time plaintiff recognized defendant Souders from a previous encounter and said, "Hey, Pig Leo! Is that Pig Leo? Do you have a lawyer yet, Pig Leo? You're going to need one in federal court! You've been named in my suit, Pig Leo!" According to them, during the entire time, plaintiff was screaming so loudly and from such a close distance that both of them had trouble hearing what the two men were saying. Plaintiff's utterances were so loud and profane that defendant White noticed several citizens were clearly disturbed by plaintiff's "protest." He observed two women, visibly upset and fearful, change directions and walk

16

completely around the scene to avoid Mr. McCormick.  The two men, who had, at first, been calm, soft-spoken and cooperative with the officers, grew more and more agitated as plaintiff continued to hurl obscenities at the officers.  Like others in the vicinity, they became visibly upset.  Their posture, disposition, and the tone of their voices changed as plaintiff continued to heap personal abuse on the officers from close range.  Mr. Canton finally had enough and yelled at plaintiff to "get the fuck out of here!  Leave the officers alone and let them do their job!"  Plaintiff explained to Mr. Canton that he was exercising his First Amendment rights and that he did not have to leave.  At that point, Mr. Canton became very upset.  He turned to defendants Souders and White and said, "If you will just turn your heads, we'll kick the shit out of him for you."  Because of plaintiff's history with defendant Souders, his loud and abusive behavior, his proximity to the scene, and the effect he was having on Mr. Canton, Mr. Meagher, and other citizens, defendants White and Souders believed that plaintiff was obstructing their legal duty and being disorderly.  Plaintiff denies this version of the events as set forth in the affidavits of defendants White and Souders.

Defendant White approached plaintiff and asked him to lower his voice and to move away from the scene.  Citing the First Amendment, plaintiff refused.  Defendant White then warned plaintiff to shut up and leave the area or he would be arrested.  According to plaintiff's affidavit, at this point he believed this threat was illegal so he pulled his microcassette recorder from his pocket, extended the device towards defendant White and said, "Can you repeat that you stupid pig?"  Defendant White then threatened to arrest him for obstruction.  Plaintiff responded by telling defendant White that it was illegal for him to

17

threaten to violate his First Amendment rights like that, "you stupid pig." The officers then placed Mr. McCormick under arrest and took his tape recorder from him. According to an affidavit from defendant White, he arrested plaintiff because he believed, based on plaintiff's behavior, that plaintiff was being disorderly and was impeding and hindering his and defendant Souders' performance of legal duties.

E.      *Carjacking Investigation Involving Defendants Hadl and Harvey*

At approximately 2:33 a.m. on April 14, 2002, a Lawrence police officer stopped a car near 13th Street and Haskell Avenue. After the stop, the passenger fled the area southbound on foot. Defendant Harvey overheard the radio traffic and proceeded to the area to assist. When he arrived, defendant Harvey learned from Officer Micah Stegall, who was investigating the incident, that the driver reported that he had been "carjacked" at knife point and that, after they had been pulled over, the suspect had fled, still armed with the knife. As the situation was explained to him, defendant Harvey noticed plaintiff, standing several feet away from the stopped car on the passenger's side, videotaping the investigation and trying to engage Officer Stegall in conversation. Neither Officer Stegall nor defendant Harvey knew plaintiff's identity. Officer Stegall told defendant Harvey that he was trying to investigate the driver's carjacking report, but that he was having difficulty doing so because plaintiff was badgering him about the stop. Officer Stegall then asked defendant Harvey to help by keeping plaintiff from interfering with his investigation.

A dialogue ensued in which, briefly summarized, plaintiff repeatedly declared that he was exercising his First Amendment right, Officer Stegall told him not to interfere with his

18

police work, defendant Harvey told plaintiff to step back, plaintiff insisted that he was protesting police activity pursuant to the Supreme Court case of *Houston v. Hill*, and defendant Harvey told plaintiff that he would arrest him if he interfered with what Officer Stegall was doing.

Meanwhile, the carjacking suspect that had fled was taken into custody. Once that happened, the crime scene at 13th and Haskell became the focus of the felony investigation. Defendant Hadl proceeded to 13th and Haskell to oversee the felony investigation. Upon her arrival, defendant Hadl noticed plaintiff (who had since returned), videotaping the officers as they worked. Defendant Hadl asked plaintiff to stand away from the scene and not interfere. Plaintiff then accused defendant Hadl of violating his First Amendment rights. Defendant Hadl informed plaintiff that an investigation was being conducted, that a crime scene was being processed, and that a victim was being interviewed. Defendant Hadl advised plaintiff not to distract any of the officers while they performed their duties. She assigned defendant Harvey to attend to plaintiff.

Plaintiff yelled at the "victim" of the carjacking, asking if he was going to allow defendant Hadl to "illegally search" his car. Defendant Hadl then approached plaintiff and defendant Harvey and advised them that they would be arresting plaintiff for obstruction of legal duty. Defendant Hadl advised plaintiff to lay his video camera on the ground so that it was not injured while he was being handcuffed. At that point, plaintiff offered to leave the area if defendant Hadl did not arrest him. Defendant Hadl accepted plaintiff's offer to leave the scene. Most, if not all, of this entire incident was captured by plaintiff on video.

F.      *The City Defendants' Motion for Summary Judgment*

Based on these facts, plaintiff asserts claims against the City defendants for violations

of his First Amendment free speech rights and his Fourth Amendment right to be free of

unreasonable searches and seizures.  The individual defendants now seek summary judgment

on the grounds that they are entitled to qualified immunity.  The City itself seeks summary

judgment on the grounds that plaintiff has not presented evidence of an official municipal

policy, practice, or custom with respect to the acts in question.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of

law." Fed. R. Civ. P. 56(c).  In applying this standard, the court views the evidence and all

reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Rost ex*

*rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing

*Scott v. Harris*, 17 S. Ct. 1769, 1774 (2007)).  An issue of fact is "genuine" if "the evidence

allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Commc'ns, LLC*,

456 F.3d 1215, 1219 (10th Cir. 2006).  A fact is "material" when "it is essential to the proper

disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine

issue of material fact and entitlement to judgment as a matter of law.  *Libertarian Party v.*

*Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S.

317, 322-23 (1986)).  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.  *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof."  *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005).  To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## MOTIONS RELATING TO PLAINTIFF'S CLAIMS AGAINST DEFENDANT WILLOUGHBY

For the reasons explained below, the court finds that the summary judgment record contains facts which, viewed in the light most favorable to Mr. McCormick, establish that defendant Willoughby violated his constitutional right to associate for the purpose of

assisting with litigation aimed at vindicating civil rights.  But, the law was not so clearly established at the time of the alleged violation that a reasonable official in defendant Willoughby's position would have understood that the actions she took violated his constitutional rights and therefore she is entitled to qualified immunity.  As such, the court will grant her motion for summary judgment and, consequently, will deny plaintiff's motions for summary judgment and for a bifurcated trial as moot.

## I.      Qualified Immunity Summary Judgment Standard

Defendant Willoughby claims she is entitled to qualified immunity on Mr. McCormick's claims against her.  "The doctrine of qualified immunity shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Eidson v. Owens*, 515 F.3d 1139, 1145 (10th Cir. 2008) (quotation omitted).  The court reviews motions for summary judgment based on qualified immunity somewhat differently than other summary judgment motions. *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008).  When a defendant asserts a qualified immunity defense, the burden shifts to the plaintiff to satisfy a strict two-part test. *Id.*  First, the plaintiff must show that the defendant's actions, viewed through the prism of the court's summary judgment standard and thus examined in the light most favorable to the plaintiff, violated a constitutional or statutory right. *Van Deelen v. Johnson*, 497 F.3d 1151, 1158 (10th Cir. 2007).  Second, the plaintiff must show that this right was clearly established at

the time of the conduct at issue.  *Clark*, 513 F.3d at 1222.  If the plaintiff fails to satisfy either part of this two-part test, the court grants qualified immunity.  *Van Deelen*, 497 F.3d at 1158.

## II.   **Constitutional Violation**

Mr. McCormick contends that Ms. Willoughby violated his constitutional rights by retaliating against him for exercising his First Amendment right of speech and association. First Amendment retaliation claims where the governmental defendant is not the plaintiff's employer nor a party to a contract with the plaintiff are analyzed using the substantive standard set forth in *Worrell v. Henry*, 219 F.3d 1197 (10th Cir. 2000).  *Shero v. City of Grove*, 510 F.3d 1196, 1203 (10th Cir. 2007).  This standard requires proof of the following elements:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero*, 510 F.3d at 1203 (citing *Worrell*, 219 F.3d at 1212).

### A.   *Constitutionally Protected Activity*

The parties hotly dispute whether Mr. McCormick's involvement with the Coburns constituted constitutionally protected activity.  Mr. McCormick, on the one hand, argues that the First Amendment affords protection to activities involving the assistance of litigation aimed at vindicating civil rights.  *See Copp v. Unified Sch. Dist. No. 501*, 882 F.2d 1547, 1550 (10th Cir. 1989) (noting that in *Owens v. Rush*, 654 F.2d 1370, 1379 (10th Cir. 1981), the Tenth Circuit construed *NAACP v. Button*, 371 U.S. 415 (1963), as protecting activities

involving the assistance of litigation vindicating civil rights).  As such, "attending meetings on necessary legal steps" and "associating for the purpose of assisting persons seeking legal redress" are modes of expression and association protected by the First Amendment.  *Owens*, 654 F.2d at 1379.  Defendant Willoughby, on the other hand, argues that Mr. McCormick's actions constituted the unauthorized practice of law and that "limits may be placed on an individual's free association and free speech rights, such as he may not practice law without a license."  *McCormick v. City of Lawrence*, 99 Fed. Appx. 169, 2004 WL 882146, at *4 (10th Cir. Apr. 26, 2004) (unpublished opinion) (citing *Lawline v. Am. Bar Ass'n*, 956 F.2d 1378, 1386 (7th Cir. 1993), for the proposition that abridgment of the right of free speech is merely an incidental effect of rules prohibiting lawyers from assisting non-lawyers in the unauthorized practice of law).

Defendant Willoughby's argument rests on the erroneous ground that governmental authorities have carte blanche authority to regulate the unauthorized practice of law without regard to the extent to which that governmental regulation infringes on an individual's First Amendment rights.  "That the States have broad power to regulate the practice of law is, of course, beyond question."  *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).  "But it is equally apparent that broad rules framed to protect the public and to preserve respect for the administration of justice can in their actual operation significantly impair the value of associational freedoms."  *Id.*  Consequently, the Supreme Court has held on several occasions that the states' interests in regulating the practice of law were insufficient to overcome the associational rights guaranteed by the First Amendment.  *See*

24

generally, e.g., *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967) (state unauthorized-practice-of-law statute could not be used to enjoin a union's employment of lawyers to advise and represent members on worker compensation claims); *Bhd. of R.R. Trainmen v. Virginia*, 377 U.S. 1 (1964) (state statutes against solicitation and unauthorized practice of law could not be used to enjoin union advisory and referral service for union members' FELA claims); *NAACP v. Button*, 371 U.S. 415 (1963) (state statute against soliciting legal business could not be used to bar NAACP from advising Virginia citizens of potential grounds for litigation to achieve school desegregation).  Thus, collective activity undertaken to obtain meaningful access to the courts is a fundamental right entitled to First Amendment protection, and broad rules framed to protect the public and to preserve respect for the administration of justice must not significantly impair the value of associational freedoms.  *In re Primus*, 436 U.S. 412, 426 (1978); *Mine Workers*, 389 U.S. at 222.

Under this line of authority, the Tenth Circuit in *Owens v. Rush*, 654 F.2d 1370, 1379 (10th Cir. 1981), allowed an undersheriff to pursue a First Amendment claim based on his allegation that the sheriff's department fired him because he assisted his wife in filing a sex discrimination claim against the department.  *Id.* at 1379.  In so holding, the court construed the Supreme Court's holding in *NAACP v. Button* as protecting activities involving the assistance of litigation aimed at vindicating civil rights.  *Id.*  Thus, the court held that "attending meetings on necessary legal steps" and "associating for the purpose of assisting persons seeking legal redress" are modes of expression and association protected by the First Amendment.

In this case, Mr. McCormick's involvement with the Coburns falls squarely within the parameters of assisting them with litigation aimed at vindicating their civil rights. Mr. McCormick gained experience as a *pro se* litigant when he filed and prosecuted a civil rights lawsuit after he was arrested on a complaint that was allegedly based on a prosecutor's false probable cause affidavit. When Ms. Coburn sought to file a similar lawsuit, she sought out Mr. McCormick's assistance in helping her to obtain legal redress. Mr. McCormick shared information with the Coburns by, for example, giving them copies of legal decisions, providing them with the names and captions of cases, looking over their pleadings and giving them his opinion about their legal arguments, and making suggestions about corrections of grammar and syntax and spelling. He served process for them. But, he never appeared or attempted to appear in court on their behalf. Other than charging the Coburns a process server fee, he never charged them for his assistance with their lawsuit. He never represented that he had any advanced legal knowledge. Under these circumstances, and particularly in light of Mr. McCormick's self-proclaimed status as a civil rights activist who has an established history of filing civil rights lawsuits as a *pro se* litigant, the court believes that the assistance Mr. McCormick gave to the Coburns with pursuing their lawsuit is more properly characterized as a vehicle for effective political expression and association as opposed to engaging in commercial speech. *Compare In re Primus*, 436 U.S. 412 (1978) (holding ACLU attorney could not be disciplined, absent a showing of actual harm to the client, for communicating in writing with a woman concerning a violation of her constitutional rights where legal services were performed at no charge by an organization that

engaged in litigation as a form of political expression and association), *with Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) (upholding discipline of attorney for in-person solicitation of personal injury claims which was motivated primarily by pecuniary gain and furthered no political or associational purposes).

Defendant Willoughby's isolated focus on whether Mr. McCormick's actions constituted the unauthorized practice of law is misplaced.   In support of this argument, defendant Willoughby has seized on an isolated excerpt from a Tenth Circuit unpublished opinion in this case in which the court noted that "limits may be placed on an individual's free association and free speech rights, such as he may not practice law without a license." *McCormick*, 2004 WL 882146, at *4 (citing *Lawline*, 956 F.2d at 1386).   The court reads the Tenth Circuit's comment on that issue, however, to be a mere observation that defendant Willoughby did not raise that particular argument on appeal.   And, significantly, *Lawline* dealt with a facial challenge to an Illinois rule prohibiting the unauthorized practice of law. 956 F.2d at 1381.   In rejecting the plaintiffs' First Amendment challenge to the rule, the Seventh Circuit reasoned that "[a]ny abridgement of the right to free speech is merely the incidental effect of observing an otherwise legitimate regulation."   *Id.* at 1386.   The court also made the following observation:

> There may well be many activities which lawyers routinely engage in which are protected by the First Amendment and which could not be constitutionally prohibited to laypersons.   However, this Court will not strike down the unauthorized practice rule as facially invalid on the assumption that the Illinois Supreme Court and the Northern District will construe their unauthorized practice prohibitions so broadly as to infringe upon protected First Amendment rights.   Although we uphold the validity of the unauthorized practice rule

against facial constitutional attack, we do not speculate as to whether this regulation would be constitutional as applied to particular cases.

*Id.* (footnote omitted).

Unlike the situation presented in *Lawline*, in this case defendant Willoughby sought to do precisely what the Seventh Circuit cautioned against by applying the unauthorized practice rule broadly to prohibit Mr. McCormick from engaging in activities that are arguably on the outer periphery of engaging in the practice of law while infringing his constitutional right to associate with others for the purpose of assisting with litigation aimed at vindicating civil rights. Viewing the evidence in the light most favorable to Mr. McCormick, as of course the court must in evaluating defendant Willoughby's motion for summary judgment, he was not engaged in the type of activities that have the traditional hallmarks of being engaged in the practice of law. He did not draft the Coburns' pleadings for them or sign their pleadings. He did not represent them in court. *See State ex rel. Morrison v. Price*, 285 Kan. 389, 396, 17 P.3d 561, 566 (2007) (holding *pro se* litigants were engaged in the unauthorized practice of law where one litigant presented the Supreme Court with oral argument on behalf of the others). He did not hold himself out as an expert and charge for his expertise. *See State ex rel. Stovall v. Martinez*, 27 Kan. App. 2d 9, 11-12, 996 P.2d 371, 375 (2000) (defendant's insurance claims consulting services involved the practice of law where he purported to be an expert, offered a service, the performance of which required knowledge of legal principles, and had a profit motive). Although Mr. McCormick looked over the Coburns' pleadings and gave them his opinion about them, the record does not reveal the

28

extent to which his "opinion" involved meaningful legal expertise. Accordingly, the summary judgment record presents a genuine issue of material fact on the first element of the *Worrell* standard on the issue of whether Mr. McCormick was engaged in constitutionally protected activity.[3]

B.     *Injury*

Under *Worrell*'s second element, Mr. McCormick must show that defendant Willoughby's actions caused him "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." 219 F.3d at 1212. Defendant Willoughby does not move for summary judgment on the ground that Mr. McCormick cannot present a genuine issue of fact on this issue. Indeed, it seems that being reported to authorities in the state attorney general's office for the purpose of being investigated would chill a person of ordinary firmness from continuing to associate with acquaintances who are pursuing similar litigation. Thus, this element of the *Worrell* standard is also satisfied.

C.     *Defendant Willoughby's Motivation*

Defendant Willoughby argues that Mr. McCormick cannot withstand summary judgment based on the third element of the *Worrell* standard—i.e., that her allegedly adverse action against him was substantially motivated as a response to the plaintiff's exercise of

---

[3] Defendant Willoughby also argues that the Coburns' attempt to vindicate their private rights did not involve an issue of public concern. The Tenth Circuit, however, recently settled the issue that the "public concern" requirement for First Amendment retaliation claims only applies in the public employment context. *Van Deelen v. Johnson*, 497 F.3d 1151, 1156-57 (10th Cir. 2007).

29

constitutionally protected conduct. Viewing the summary judgment record in the light most favorable to Mr. McCormick, this argument is without merit. It is undisputed that defendant Willoughby told Mr. McCormick that he had better not be practicing law without a license and, furthermore, she reported him to the Consumer Protection Division as a direct result of her receipt of pleadings in the *Coburn* lawsuit. A rational trier of fact weighing these considerations, particularly when combined with the timing of defendant Willoughby's report to the Consumer Protection Division in relation to other litigation, could readily conclude that her actions were substantially motivated as a response to Mr. McCormick's association with the Coburns. Accordingly, the summary judgment record also presents a genuine issue of fact on the third element of the *Worrell* standard.

In sum, Mr. McCormick has presented facts which, viewed in the light most favorable to him, establish a violation of his First Amendment rights. Having satisfied the first step of the qualified immunity inquiry, then, the court must turn to the second step, which is evaluating whether plaintiff has shown that this right was clearly established at the time of the conduct at issue.

### III.   <u>Clearly Established Law</u>

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To be clearly established, the contours of a right "must be sufficiently clear that a reasonable

official would understand that what he [or she] is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *accord Mecham v. Frazier*, 500 F.3d 1200, 1205-06 (10th Cir. 2007). "That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law that unlawfulness must be apparent." *Hope*, 536 U.S. at 739. The inquiry is an objective one that "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 553 U.S. 194, 201 (2001); *Mecham*, 500 F.3d at 1205-06. "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation." *Saucier*, 553 U.S. at 202; *accord Mecham*, 500 F.3d at 1206; *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007). While the facts of the case need not be identical, they must be sufficiently analogous to satisfy the particularized context necessary to support liability. *Mecham*, 500 F.3d at 1206.

Thus, the relevant inquiry is whether a reasonable official in defendant Willoughby's position would have had fair warning in 2001 and 2002 that telling Mr. McCormick that he had better not be practicing law and reporting him to the Consumer Protection Division for what she believed to be the unauthorized practice of law would violate his First Amendment right to associate with others for the purpose of assisting with litigation aimed at vindicating civil rights. Plaintiff contends that the rights of speech and association have been clearly established for more than two decades, citing *In re Primus*, 436 U.S. 412 (1978); *United Mine Workers of Am. v. Ill. State Bar Ass'n*, 389 U.S. 217 (1967); *Bhd. of R.R. Trainmen v.*

*Virginia*, 377 U.S. 1 (1964); *NAACP v. Button*, 371 U.S. 415 (1963).  Certainly, these cases support the broad general proposition that there is a First Amendment right to associate with others for the purpose of assisting with litigation aimed at vindicating civil rights, and broad rules regulating the practice of law must not significantly impair that right.  But, the facts of those cases involve the infringement of First Amendment rights in a context that is markedly different from the arguable infringement of Mr. McCormick's First Amendment rights by defendant Willoughby.  For example, in *NAACP v. Button*, the NAACP was successful in a facial challenge to a Virginia statute that had been construed by the state courts to proscribe NAACP members and attorneys from advising prospective litigants to seek the assistance of particular attorneys.  In *Brotherhood of Railroad Trainmen*, the Supreme Court determined that the plaintiff union was constitutionally protected in having a Legal Aid Department that advised injured workers to obtain legal advice and recommended specific lawyers.  *United Mine Workers* was initiated by a complaint by the Illinois state bar association to enjoin a union from engaging in the alleged unauthorized practice of law by employing a licensed attorney to work on a salary basis to represent union members who wished his services to prosecute workmen's compensation claims.  And, in *In re Primus*, the Court reversed a disciplinary reprimand issued against an attorney by holding that the state could not justify broad disciplinary rules which prevented the solicitation of prospective litigants undertaken to express the ACLU's political beliefs and advance its civil liberties objectives, where the attorney did not stand to gain personally from the solicitation.  In each of these cases, the individuals or groups subjected to state regulation governing the practice of law were

32

confronted with some type of formal action either taken against them or initiated by them.

In contrast, here, defendant Willoughby did little more than warn Mr. McCormick that he had

better not be practicing law and refer the matter to her colleagues for further investigation.

That investigation did not culminate in any type of formal charge or lawsuit. Consequently,

it would not have been clear in light of pre-existing law to a reasonable official that the

particular action taken by defendant Willoughby of merely telling Mr. McCormick that he

had better not be practicing law and referring the matter for further investigation would have

violated plaintiff's constitutional rights.

Plaintiff also relies on *Owens v. Rush*, 654 F.2d 1370 (10th Cir. 1981). Again, *Owens*

certainly supports the broad proposition that Mr. McCormick had a constitutional right to

associate with others for the purpose of assisting with litigation aimed at vindicating civil

rights. But the facts of that case are not sufficiently analogous to have given defendant

Willoughby fair warning that her actions violated Mr. McCormick's First Amendment rights.

In *Owens*, the Tenth Circuit allowed an undersheriff to pursue a First Amendment claim

based on his allegation that the sheriff's department fired him because he assisted his wife

in filing a sex discrimination claim against the department. *Id.* at 1379. In that case, then,

the alleged constitutionally protected activity was the same as in this case (associating for the

purpose of assisting with litigation aimed at vindicating civil rights), but the alleged

retaliatory action was nothing like defendant Willoughby's here. There, the defendant was

fired by a sheriff's department that was akin to his employer whereas, here, defendant

Willoughby in the course of her duties with the State Attorney General's Office came across

what she believed to be the unauthorized practice of law and confronted the situation. Unlike the concrete action taken by the defendants in *Owens*, here defendant Willoughby merely told Mr. McCormick that he had better not be practicing law and referred the matter for further investigation. Her retaliatory acts bear little, if any, resemblance to the one at issue in *Owens*. Consequently, the factual context of *Owens* did not give defendant Willoughby fair warning that her actions would violate Mr. McCormick's constitutional rights.

In sum, Mr. McCormick has not directed the court's attention to any case from the Supreme Court or the Tenth Circuit, and the court has not located any such case, which would clearly establish in a more particularized sense that defendant Willoughby's actions in telling Mr. McCormick that he had better not be practicing law and reporting him to the Consumer Protection Division for what she believed to be the unauthorized practice of law violated his First Amendment right to associate with others for the purpose of assisting with litigation aimed at vindicating civil rights. Indeed, as the preceding lengthy discussion demonstrates, it was not even readily apparent to the court that the summary judgment record demonstrates the violation of a constitutional right. Under these circumstances, it can hardly be said that it would have been clear to a reasonable official that defendant Willoughby's conduct was unlawful in the situation. Defendant Willoughby, then, is entitled to qualified immunity because no clearly established law prohibited her response to what she believed to be the unauthorized practice of law. Accordingly, defendant Willoughby's motion for summary judgment is granted, Mr. McCormick's motion for summary judgment on the issue of liability is denied as moot, and his motion for bifurcated trial is denied as moot.

34

**CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons explained below, the court finds that plaintiff has raised genuine issues of material fact sufficient to withstand summary judgment and, in particular, to withstand defendants' claims of qualified immunity on his First Amendment retaliation claims against defendants Crouse, Mann, Byrn, White, and Souders. Plaintiff has not established the existence of a constitutional violation by defendants Farrar, Harvey, and Hadl, and therefore those defendants are entitled to summary judgment. As to plaintiff's Fourth Amendment claim against defendants White and Souders, disputed issues of fact preclude summary judgment on his unlawful arrest claim, but plaintiff has not overcome their assertion of qualified immunity with respect to his unconstitutional seizure of property claim. Lastly, summary judgment is denied as to plaintiff's claim against the City itself because disputed issues of fact exist concerning whether the City's failure to train its officers how to handle the repeated encounters with plaintiff amounted to deliberate indifference.

## I.    Under Color of State Law

As a threshold matter, the City defendants argue that they are entitled to summary judgment because plaintiff does not allege in the pretrial order that they were acting under color of state law. *See* 42 U.S.C. § 1983 (providing for a cause of action against person acting under color of state law). Defendants do not, of course, contend that they in fact were not acting under color of state law. Furthermore, they do not contend that they would be prejudiced if the court were to allow the pretrial order to be amended to conform to the evidence on this point. Indeed, plaintiff explains that his First Amended Complaint

specifically averred that they were acting under color of state law and there never has been a suggestion in this case, which has been pending and actively litigated for more than six years, that the defendants were not acting under color of state law.  Consequently, the court will deem the pretrial order amended to conform to the evidence on this point, *see* Fed. R. Civ. P. 15(b), and will deny the City defendants' motion based on such an obvious hyper-technicality.

## II.    First Amendment Retaliation Claims

Plaintiff's First Amendment retaliation claims are analyzed under the same qualified immunity framework set forth above with respect to his claim against defendant Willoughby. As such, the court first asks, first, whether plaintiff has established a constitutional violation under the three-part *Worrell* standard and, second, whether the law was clearly established such that a reasonable official would have understood that what he or she was doing amounted to a violation of Mr. McCormick's constitutional rights.  With this framework in mind, the court proceeds to analyze the various incidents that form the basis of plaintiff's claims.

### A.    *Defendant Crouse Parked In Front of Plaintiff's Driveway*

Defendant Crouse contends that he is entitled to summary judgment on the grounds that Mr. McCormick was not engaged in constitutionally protected activity because he used "fighting words."  In *Houston v. Hill*, 482 U.S. 451 (1987), the Supreme Court reasoned that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," and that "[t]he freedom of individuals verbally to oppose or

challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 461-63. That freedom is not without limits, however, in that "'fighting words' which 'by their very utterance inflict injury or tend to incite an immediate breach of the peace' are not constitutionally protected." *Id.* at 463 n.12 (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). The fighting words doctrine has an even narrower application where, as here, an individual's speech offends a police officer. *Id.* at 462. This is because a properly trained police officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words. *Chaplinsky*, 315 U.S. at 571-72. As the Supreme Court observed in *Hill*, speech is often provocative and challenging, but it is nevertheless protected unless it is shown likely to produce a "clear and present danger or a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* at 461. Thus, the Tenth Circuit has defined "fighting words" as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1285 (10th Cir. 2003) (quotation omitted); *accord Cannon v. City & County of Denver*, 998 F.2d 867, 873 (10th Cir. 1993).

In this case, the summary judgment record contains issues of fact as to whether Mr. McCormick's speech to defendant Crouse involved fighting words. Viewed in the light most favorable to Mr. McCormick, after he went in the house he came back out and asked defendant Crouse – calmly and jovially – why he had been illegally parked in front of his

driveway.  It was in response to defendant Crouse's insistence that he was not illegally parked that plaintiff first called him a "cognitively impotent pig."  Defendant Crouse then escalated the incident by threatening to take Mr. McCormick to jail.  The video footage of the ensuing encounter demonstrates that plaintiff was trying to get clarification as to defendant Crouse's purported justification for the arrest and defendant Crouse came up with an after-the-fact justification that Mr. McCormick was being disorderly.  When plaintiff then proceeded to call defendant Crouse names, he insisted that he was exercising his constitutional rights in doing so and that it would constitute a violation of his rights if defendant Crouse were to arrest him for that reason.  Mr. McCormick's speech certainly consisted of epithets directed at defendant Crouse.  But, the overall theme of his banter, as he himself proclaimed, was the expression of his idea that "you pigs make me sick."  The court has reviewed the video footage of a portion of the incident, and based on Mr. McCormick's demeanor it hardly seems likely that his chiding posed such a clear and present danger that it was inherently likely to produce a violent reaction from defendant Crouse, whose professional duty is to uphold the peace.  Rather, a trier of fact could conclude that he was simply voicing his opposition and challenging defendant Crouse's police action and, as such, his speech was entitled to First Amendment protection.  *See, e.g.*, *Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005) (genuine issues of material fact as to whether "unpleasant but petty" derogatory language was sufficiently provocative to constitute fighting words).

Defendant Crouse also contends that his threat was justified because plaintiff was being disorderly in violation of K.S.A. § 21-4101(c).  This argument is without merit for two

38

reasons.  First, the record does not demonstrate that Mr. McCormick was being disorderly.

Rather, he was just discussing the matter with defendant Crouse in a confrontational manner.

He was not yelling and screaming, albeit his voice reflected a certain degree of energy and

excitement about the encounter.  Second, and more obviously, § 21-4101(c) prohibits only

fighting words.  *State v. Huffman*, 228 Kan. 186, 612 P.2d 630, 635-36 (1980); *see generally*

*United States v. McKinney*, 9 Fed. Appx. 887, 2001 WL 565745, at *1-*2 (10th Cir. May 25,

2001) (defendant could not be convicted of disorderly conduct under K.S.A. § 21-4101(c)

for telling military police officer to go fuck himself where defendant did not threaten or offer

to fight the officer because the statute only prohibits fighting words and such language would

not incite an immediate breach of the peace).  As explained above, the record presents a fact

question for the jury as to whether plaintiff's speech constituted fighting words.

Next, defendant Crouse contends that plaintiff has not shown that his arrest warning

was motivated by plaintiff's protected speech.  In support of this argument, defendant Crouse

has submitted his own statement this his arrest warning was motivated by the fact that

plaintiff was standing in the middle of the street in a residential neighborhood upsetting the

neighbors by being loud and disorderly.  Viewing the record in the light most favorable to

plaintiff, however, a jury could readily conclude that his verbal tirade was precisely why

defendant Crouse threatened to arrest him.  According to Mr. McCormick, defendant Crouse

first made the threat before the incident was captured on video in response to plaintiff's calm

and jovial statement that defendant Crouse was a "cognitively impotent pig" (presumably

because he did not know that he had been parked illegally).  It was only later, when plaintiff

came out of the house with his video camera, that defendant Crouse justified the threat on the grounds that plaintiff was being disorderly. And, significantly, at one point defendant Crouse explained to plaintiff that he was being disorderly when he was "out here calling [him] a pig." Thus, the record presents a fact question for the jury as to defendant Crouse's motivation for the threat. Accordingly, plaintiff has established a constitutional violation sufficient to satisfy the first step of the qualified immunity inquiry as to his claim against defendant Crouse.

        B.       *Traffic Stop Involving Defendant Mann*

Defendant Mann seeks summary judgment on the grounds that plaintiff's speech involved fighting words. In support of this argument, he contends that plaintiff hurled obscenities and personal taunts at defendant Mann. His arguments, however, rest on an affidavit in which he states his version of the events. This affidavit is directly controverted by Mr. McCormick's affidavit in which he states his version of the incident, which of course the court must accept as true at the summary judgment stage. Viewed in the light most favorable to plaintiff, plaintiff was simply protesting police activity from a significant enough distance away that the speech could not plausibly be regarded as a clear and present danger. Also, defendant Mann points out that after he arrested plaintiff, plaintiff called him "Tippy Turtle" and regaled him with his theme song. The court would agree that those types of personal attacks would go beyond the realm of fair comment or public protest and show that plaintiff was far more interested in provoking defendant Mann than in protesting police work.

But, that speech followed the alleged retaliatory conduct – i.e., the arrest.  Consequently, those post-arrest verbal attacks do not form the basis of this claim.

Defendant Mann also contends that his actions were justified because plaintiff was obstructing his legal duties in violation of K.S.A. § 21-3808(a).  Again, however, this argument rests on defendant Mann's affidavit that plaintiff was interfering with the traffic stop.  Accepting plaintiff's affidavit as true, he was standing twenty-five feet away on the sidewalk using a normal tone of voice no louder than necessary for it to be heard by the officers.  He was not shouting, yelling, or using profanity.  He was simply telling defendant Mann to leave the people alone.  These facts simply do not demonstrate that Mr. McCormick was obstructing defendant Mann from pursuing the traffic stop.

According to defendant Mann, plaintiff's claim against him also fails on the second *Worrell* element – i.e., that he did not cause plaintiff to suffer an injury that would chill a person of ordinary firmness – because defendant Mann did nothing more than ask plaintiff to move away from the scene and lower his voice.  To the contrary, however, the record reveals that defendant Mann opted to abandon the traffic stop that was underway and then proceeded to arrest plaintiff.  Certainly, being arrested would chill a person of ordinary firmness from exercising First Amendment rights.

Finally, defendant Mann argues that Mr. McCormick cannot demonstrate that his response was substantially motivated by his speech.  His rationale on this point is that the only reason he asked plaintiff to move away were safety concerns and because plaintiff's nearness and volume hampered his ability to complete the traffic stop.  Once again, however,

41

this argument would require the court to accept defendant Mann's affidavit as true. This affidavit is controverted by the contents of plaintiff's affidavit from which, accepted as true, a rational trier of fact could conclude that Mr. McCormick's speech sufficiently irked defendant Mann that he shifted his focus from the traffic stop underway to finding a reason to arrest plaintiff. Accordingly, plaintiff has established a constitutional violation sufficient to satisfy the first step of the qualified immunity inquiry as to his claim against defendant Mann.

C.      *Incident at Municipal Court Involving Defendants Byrn and Farrar*

The City defendants' motion for summary judgment on plaintiff's claim against defendants Byrn and Farrar is denied for much the same reasons as discussed above with respect to his claims against defendants Crouse and Mann. Briefly summarized, the motion rests on a version of the facts which is directly controverted by the version of the events set forth in plaintiff's affidavit. As such, the record contains fact questions which preclude summary judgment as to whether plaintiff's speech was constitutionally protected or whether it constituted fighting words, as well as the issue of whether he was being disorderly. And, a trier of fact viewing the record in the light most favorable to plaintiff could certainly conclude that defendant Byrn's threat to arrest plaintiff was substantially motivated by plaintiff greeting him with, "Hi, pig!" Accordingly, plaintiff has established a constitutional violation sufficient to satisfy the first step of the qualified immunity inquiry as to his claim against defendant Byrn.

On the other hand, as to defendant Farrar, there is no suggestion in the record that he threatened to arrest plaintiff or took any other action against plaintiff that would chill a person of ordinary firmness from continuing to engage in constitutionally protected speech. Because plaintiff has failed to create a genuine issue of material fact on the second *Worrell* element as to his claim against defendant Farrar, then, he has not established that defendant Farrar violated his constitutional rights.  As such, defendant Farrar is entitled to qualified immunity on plaintiff's claim against him.  Accordingly, the City defendants' motion is granted with respect to plaintiff's claim against defendant Farrar.

### D. *Plaintiff's Protest Involving Defendants White and Souders*

The City defendants' motion for summary judgment on plaintiff's claim against defendant White and Souders is denied for essentially the same reasons as with respect to his claim against defendant Mann.  In sum, viewing the summary judgment record in the light most favorable to Mr. McCormick, he was protesting police activity from a public sidewalk approximately twenty feet away from the officers.  His demeanor was calm and jovial and not loud enough that it would necessarily have been interfering with their police duties.  As such, a rational trier of fact could conclude that his speech was protected rather than being considered fighting words, disorderly conduct, and/or an obstruction of legal duties. Additionally, there is a fact question as to the officers' motive for the arrest inasmuch as it is unclear whether plaintiff's behavior was so obnoxious that they were essentially forced to abandon their focus on the two men, or whether they were simply more irked by his behavior and therefore they chose to divert their attention towards him.  Accordingly, plaintiff has

43

established a constitutional violation sufficient to satisfy the first step of the qualified immunity inquiry as to his claim against defendants White and Souders.

### E.   *Carjacking Investigation Involving Defendants Hadl and Harvey*

After carefully reviewing the record and the video of plaintiff's activities at the carjacking investigation involving defendants Hadl and Harvey and the nature and context of plaintiff's speech at the scene, the court concludes that his speech is not entitled to constitutional protection because it involved "fighting words." The Tenth Circuit has defined "fighting words" as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Burns v. Bd. of County Comm'rs*, 330 F.3d 1275, 1285 (10th Cir. 2003) (quotation omitted); *accord Cannon v. City & County of Denver*, 998 F.2d 867, 873 (10th Cir. 1993). Here, plaintiff's speech was directed at the officers at the scene, including Officer Stegall and, more predominantly, defendant Harvey as well as defendant Hadl. In light of the fact that the officers were trying to investigate a crime, his constant, loud, disruptive banter was of the type that was likely to cause a violent reaction in the sense that it would "tend to incite an immediate breach of the peace," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942) – that breach of the peace being, namely, his immediate arrest for being disorderly and interfering with a police investigation if he did not stop. His speech played no meaningful role in the expression of ideas, but instead was obviously designed to goad the officers into retaliating against him while deliberately interfering with their investigation. Accordingly, the City defendants' motion is granted as to plaintiff's claims against defendants Harvey and Hadl. *See, e.g.,*

*Gilles v. Davis*, 427 F.3d 197, 205 (3d Cir. 2005) (affirming district court's grant of summary judgment for fighting words, and noting that the police may arrest for disorderly conduct even though some parts of the speech may be less provocative); *cf. State v. Overholt*, Case No. 2905-M, 1999 WL 635717, at *4 (Ohio Ct. App. Aug. 18, 1999) (noting that "[d]efendant's refusal to leave the scene when requested and his interference with the officers' attempts to complete an arrest, coupled with his repeated, prolonged, and profane outbursts" were unprotected fighting words).

## F. *Clearly Established Law*

As plaintiff has established a constitutional violation with respect to his claims against defendants Crouse, Mann, Byrn, White, and Souders, the court must turn to the second step of the qualified immunity analysis on those claims. Thus, the court asks whether reasonable officials in their position would have had fair warning based on clearly established law that arresting and/or threatening to arrest plaintiff for his constitutionally protected speech would violate his First Amendment free speech rights because, as discussed above, construed in plaintiff's favor the record supports a finding that as to those defendants plaintiff did not engage in fighting words. The law is clearly established that the First Amendment protects a "significant amount of verbal criticism and challenge directed at police officers" so long as the activity does not involve "fighting words." *Houston v. Hill*, 482 U.S. 451, 461, 464 (1987). Consequently, reasonable officials would have known that their retaliatory actions would violate plaintiff's constitutional rights and therefore they are not entitled to qualified immunity. *See, e.g.*, *Greene v. Barber*, 310 F.3d 889, 897-98 (6th Cir. 2002) (denying claim

45

of qualified immunity where reasonable officer should have known that an arrest undertaken at least in part as retaliation for a constitutionally protected insult to the officer's dignity – calling the officer an "asshole" – would be impermissible).

Defendants nonetheless rely on the opinion of another judge of this court in *McCormick v. City of Lawrence*, 325 F. Supp. 2d 1191, 1201 (D. Kan. 2004), *aff'd* 130 Fed. Appx. 987, 2005 WL 1221632, at *1 (10th Cir. May 24, 2005), which held that defendants were entitled to qualified immunity under similar circumstances.  In that case, however, Judge VanBebber found, first and foremost, that plaintiffs engaged in fighting words rather than protected speech.  He then proceeded to remark that even if plaintiffs had established a constitutional violation they would nevertheless be entitled to qualified immunity because the law was not clearly established.  The Tenth Circuit affirmed on the grounds that the district court correctly decided the case.  2005 WL 1221632, at *2.  In other words, then, the court affirmed on the grounds that the speech at issue in that case constituted fighting words as a matter of law.  In that respect, the other *McCormick* case aligns with this court's holding as to defendants Harvey and Hadl, not on the "clearly established law" issue.  The claims against the remaining individual defendants are distinguishable simply because they involve different facts which create an issue for the jury as to whether they involved constitutionally protected speech or fighting words.  Accordingly, defendants Crouse, Mann, Byrn, White, and Souders are not entitled to qualified immunity and their motion for summary judgment on plaintiff's claims against them is denied.

### III.    Fourth Amendment Claim Against Defendants White and Souders

Plaintiff claims that defendants White and Souders arrested him and seized his microcassette recorder without probable cause in violation of his Fourth Amendment right to be free from unreasonable searches and seizures. To establish a violation of the Fourth Amendment in a § 1983 action, the plaintiff must demonstrate that a seizure occurred and that the seizure was unreasonable. *Bradford v. Wiggins*, 516 F.3d 1189, 1196 (10th Cir. 2008). As to plaintiff's arrest, the seizure was reasonable only if supported by probable cause. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007). Probable cause to arrest exists if the facts and circumstances within the officer's knowledge are sufficient to justify a prudent officer in believing the defendant committed or is committing an offense. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007). Defendants White and Souders seek summary judgment on the grounds that they had probable cause to believe that plaintiff was being disorderly and obstructing their legal duties. Certainly, if the trier of fact believes their version of events, then they should prevail on this claim. But, the court is not permitted to weigh the competing evidence at this procedural juncture. Instead, the court must accept as true plaintiff's affidavit in which he recites his version of the incident and expressly denies many of defendants White and Souders' statements. For essentially the reasons discussed above with respect to plaintiff's First Amendment claim, then, the summary judgment record viewed in the light most favorable to plaintiff reflects that his arrest was not supported by probable cause, but instead that defendants White and Souders were easily distracted from the two men with the moped because they were irked by plaintiff's chiding. Consequently, the question of whether his arrest was supported by probable cause is a disputed issue that

47

must be resolved by the jury. *See Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (noting that where the facts are disputed it is a jury question in a civil rights suit whether an officer had probable cause to arrest).

Defendants White and Souders further argue that they are entitled to qualified immunity because a reasonable officer could have believed that plaintiff was using fighting words and otherwise obstructing their legal duties. In the context of a warrantless arrest in a § 1983 action, the court "must grant a police officer qualified immunity 'if a reasonable officer could have believed that probable cause existed to arrest the plaintiff.'" *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). But, the court may not grant qualified immunity in this context if material facts are in dispute. *Id.* Here, as discussed previously, the record is permeated with disputed issues of fact concerning the encounter between plaintiff and officers White and Souders. Consequently, they are not entitled to qualified immunity at this procedural juncture. *See id.* (finding district court erred in granting qualified immunity on unlawful arrest claim where there were disputed factual issues that must be resolved by a jury).

On the other hand, their motion for summary judgment on plaintiff's unlawful seizure claim relating to the microcassette recorder is granted. The parameters of this claim are not readily apparent to the court, and plaintiff has made no meaningful attempt to meet the substance of defendant's arguments on this claim. It is well settled that plaintiff has the burden of overcoming defendants' assertion of qualified immunity. Having failed to advance any meaningful discussion of this claim, including failing to show that the law was clearly

established on this issue, then, plaintiff has not met his summary judgment burden and therefore defendants are entitled to qualified immunity on this claim.

**IV.** **Claim Against the City of Lawrence**

Municipalities may not be subjected to respondeat superior liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1210 (10th Cir. 2006). A municipality can be liable under § 1983 only if the plaintiff shows that a municipal policy or custom was the moving force behind the constitutional deprivation. *Monell*, 436 U.S. at 694. A plaintiff seeking to impose liability on a municipality under § 1983 must identify a municipal policy or custom that caused the plaintiff's injury. *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003). Plaintiff's theory concerning the City's liability is that the City officers have arrested him or threatened to arrest him in response to his constitutionally protected speech nearly every time he makes a protest. In addition to the summary judgment record in this case, he also asks the court to take judicial notice of *McCormick v. City of Lawrence*, Case No. 03-2418-KHV, in which the jury found one of the City's officers guilty of retaliating against his protected speech. This theory is essentially of the nature that the claimed constitutional deprivations were caused by a municipal custom. *See, e.g.*, *Bd. of County Comm'rs*, 520 U.S. at 403-04 (municipal "custom" are practices by city officials that are so widespread as to have the force of law); *Marshall*, 345 F.3d at 1177 ("'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have

the force of law"). Even more precisely, the gist of plaintiff's argument sounds in the nature of a failure-to-train theory. This is because the record does not really permit a reasonable inference that the City actually trained its police officers to engage in the conduct of which plaintiff complains. Instead, the inference to be drawn is that they reacted logically to plaintiff's heckling without regard to the fact that his protests arguably involved constitutionally protected speech. In short, they failed to train the officers how to respond – or, perhaps more precisely, how not to respond – to encounters with Mr. McCormick.

In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court held that an "inadequate training" claim could be the basis for municipal liability under § 1983 only in "limited circumstances." *Id.* at 387. Under *City of Canton*, "a municipality may be liable under § 1983 for an officer's constitutional violation if the violation was the result of inadequate police training and the municipality's failure to train the officer amounted to deliberate indifference to the rights of those 'with whom police come into contact.'" *Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1178 (10th Cir. 2007) (quoting *City of Canton*, 489 U.S. at 388). The court explained that a municipality typically would not have an inadequate training program, but it may happen that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390; *accord Simpson*, 500 F.3d at 1178. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a

constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998).  In most instances, notice can be established by proving the existence of a pattern of conduct.  *Id.*

Viewing the summary judgment record in the light most favorable to plaintiff, a disputed issue of fact exists for the jury as to whether the City was deliberately indifferent to plaintiff's constitutionally protected rights to openly criticize police officers without retaliation.  Plaintiff's heckling of Lawrence police officers was a recurring situation that, given the provocative and unpleasant nature of the encounters, presented an obvious potential that police officers would impermissibly retaliate against him.  Under these circumstances, a rational trier of fact could characterize the City's failure to train its police officers how to handle the repeated encounters with plaintiff as being deliberately indifferent to his First Amendment rights.  Furthermore, this failure to train was the moving force behind the claimed constitutional violations.  As plaintiff has raised a genuine issue of fact on this claim against the City, then, the City's motion for summary judgment on this claim is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant Willoughby's Motion for Summary Judgment (doc. #370) is granted.

**IT IS FURTHER ORDERED** that plaintiff's Motion for Summary Judgment (doc. #380) and plaintiff's Motion for Bifurcated Trial (doc. #382) are denied as moot.

**IT IS FURTHER ORDERED** that the City defendants' motion for summary judgment (doc. #378) is granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 18th  day of April, 2008.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge